979 P.2d 1086

Debbie **TAYLOR–RICE, Individually and as Special Administrator of the Estate of Alexa Dawn Taylor, Plaintiffs–Appellees,**

v.

**STATE of Hawai'i, Defendant–Appellant,**

**and**

**Kenneth Richard Leigh; Linda Nusser; Citizens Utilities Company, a Delaware corporation, dba Kaua'i Electric; GTE Hawaiian Tel Corp., Inc., a Hawai'i corporation, dba GTE Hawaiian Tel Co. Corp.; John Does 1–10; Jane Does 1–10; Doe Partnerships 1–10; Doe Corporations 1–10; Roe "Non–Profit" Corporations 1–10; and Roe Governmental Entities 1–10 (Civ. No. 94–0173).**

**Edward J. Blasie, Sr., Individually and as Special Administrator of the Estate of Darlene T. K. Blasie; and Carol K. Blasie, Plaintiffs–Appellees,**

v.

**State of Hawai'i, Defendant–Appellant,**

**and**

**Kenneth Richard Leigh; Linda Nusser; Citizens Utilities Company, a Delaware corporation, dba Kaua'i Electric; GTE Hawaiian Tel Corp., Inc., a Hawai'i corporation, dba GTE Hawaiian Tel Co. Corp.; John Does 1–10; Jane Does 1–10; Doe Partnerships 1–10; Doe Corporations 1–10; Roe "Non–Profit" Corporations 1–10; and Roe Governmental Entities 1–10 (Civ. No. 94–0206).**

**Rudolphus Verdoorn, Plaintiff–Appellee,**

v.

**State of Hawai'i, Defendant–Appellant,**

**and**

**Kenneth Richard Leigh; Linda Nusser; Citizens Utilities Company, A Delaware corporation, dba Kaua'i Electric; GTE Hawaiian Tel Corp., Inc., A Hawai'i Corporation, dba GTE Hawaiian Tel Co. Corp.; John Does 1–10; Jane Does 1–10; Doe Partnerships 1–10; Doe Corporations 1–10; Roe "Non–Profit" Corpora-**

tions 1–10; and Roe Governmental Entities 1–10 (Civ. No. 94–0259).

No. 21489.

Supreme Court of Hawai'i.

June 30, 1999.

Nelson Y. Nabeta and Thomas R. Keller, Deputy Attorneys General, on the briefs,for defendant-appellant.

Peter Van Name Esser, on the briefs, Honolulu, for plaintiffs-appellees Edward J. Blasie, Sr. and Rudolphus Verdoorn.

Trudy K. Senda and Randal G.B. Valenciano, on the briefs, Lihue, for plaintiffs-appellees Debbie Taylor–Rice and Edward J. Blasie, Sr.

Daniel E. Chur (of Robinson & Chur), on the briefs, Honolulu, for plaintiff-appellee Rudolphus Verdoorn.

MOON, C.J., KLEIN, LEVINSON, NAKAYAMA, and RAMIL, JJ.

Opinion of the Court by MOON, C.J.

Following a bench trial in the fifth circuit court, defendant-appellant State of Hawai'i (the State) was found jointly and severally liable for damages resulting from a single-car accident that occurred when defendant Kenneth Richard Leigh drove his car off Kūhiō Highway on Kaua'i, striking the buried end of a guardrail and vaulting into a utility pole. The accident resulted in the death of two passengers, Alexa Dawn Taylor (Alexa) and Darlene T.K. Blasie (Darlene) and caused serious injury to a third passenger, plaintiff-appellee Rudolphus Verdoorn. Plaintiff-appellant Debbie Taylor–Rice, individually and as special administrator of Alexa's estate, plaintiff-appellee Edward J. Blasie, Sr., individually and as special administrator of Darlene's estate, plaintiff Carol K. Blasie,[1] and Verdoorn [hereinafter, collectively, the Plaintiffs] brought separate actions against the State, Leigh, and others.[2] Leigh defaulted, and the cases were subsequently consolidated and tried.

On appeal, the State contends that the trial court erred when it concluded that: (1) The State was under a duty to improve the guardrail up to contemporary engineering standards as part of a 1990 road resurfacing project; (2) the State breached its duty by failing to improve the guardrail prior to the accident; (3) the negligence of the State was a legal cause of the accident which resulted in the Plaintiffs' injuries and damages; (4) the State was not immune, pursuant to the State Tort Liability Act, Hawai'i Revised Statutes (HRS) § 662–15(1) (1993), from liability arising from decisions concerning the improvement of the guardrail; and (5) the State had reasonable notice of a prior occurrence under similar circumstances and was therefore jointly and severally liable with Leigh.

Because each of the State's contentions lack merit, we affirm the decision and order of the trial court.

## I. BACKGROUND

The following facts were adduced at the bench trial and have not been disputed by the State. As Plaintiffs point out, the

---

1. We note that plaintiff Carol K. Blasie stipulated to a dismissal of her claims with prejudice.

2. The Plaintiffs also included claims against defendants Linda Nusser (owner of the vehicle), GTE Hawaiian Telephone Corporation, and Citizens Utility Company; however, these claims were dismissed prior to trial.

State has failed to challenge [3] any of the trial court's 125 well-supported findings of fact (FOF) and, as a result, the State has waived any challenge to such findings, and they are binding. *See Kawamata Farms, Inc. v. United Agri Products*, 86 Hawai'i 214, 252, 948 P.2d 1055, 1093 (1997) ("If a finding is not properly attacked, it is binding; and any conclusion which follows from it and is a correct statement of law is valid." (Citation omitted.)).

On the evening of February 21, 1994, Alexa, Darlene, Verdoorn, Leigh, and another passenger, Scott Howard, met at a youth hostel in Kapa'a. Alexa and Howard had just returned from an ABC store in Kapa'a, where they purchased two 750–ml bottles of Steinlager beer. At about 11:30 p.m., they all decided to drive to a lighthouse at Ninini Point in Nāwiliwili; Leigh drove them there in his 1982 Honda Accord three-door sedan. Howard and Alexa took the beer bottles with them in the Honda when they left the hostel for the lighthouse. They drove to a 7–11 store in Hanamā'ulu, where Howard and Darlene purchased two six-packs of Budweiser beer. Leigh drank one beer while driving to the lighthouse.

Leigh drove erratically on the way to the lighthouse, exceeding the speed limit on a handful of occasions. They stayed at the lighthouse for approximately one hour, during which time Leigh finished two beers. On the way back from the lighthouse to the hostel, Leigh drove the Honda off a dirt road while he was watching a plane land. The left side of the Honda ended up in a ditch, requiring Alexa, Howard, and Verdoorn to get out of the car and push it back onto the road. Thereafter, Alexa, Verdoorn and Howard suggested that Leigh let one of them drive. Leigh refused. They all re-entered the vehicle, and Leigh resumed driving.

As they approached the Hanamā'ulu intersection, Leigh began speeding. When they neared the Outrigger Hotel, he picked up even more speed and began crossing the median yellow lines. As their speed increased, the passengers began pleading with Leigh to slow the car. As they descended a hill near Marine Camp Road at about 12:55 a.m., Officer Jeffrey Callejo clocked the Honda traveling at 80 miles per hour (mph). Callejo then turned on his patrol vehicle's blue lights and pursued the Honda. Leigh applied his brakes, slowing the speed of the car.

At this point, the Honda was traveling along Kauai's Kūhiō Highway. As Callejo followed the Honda, which was on the inside northbound lane (lane 1), he observed the Honda move into the outside northbound lane (lane 2) and then onto the makai shoulder of the highway, where it "ramped" onto the guardrail near mile marker # 4. In moving from lane 1 to lane 2, and eventually onto the makai shoulder, the Honda did *not* turn or jerk suddenly, but drifted to the right. After ramping the guardrail, the right portion of the Honda collided with a utility pole located behind the guardrail. The Honda then spun and came to a rest in lane 1, facing northwest.

David Yoshida, Ph.D. (Dr. Yoshida), an expert qualified in accident reconstruction, examined the accident scene, the guardrail, and the Honda, as well as police reports relevant to the accident. At trial, Dr. Yoshida concluded, and the trial court found, that the angle of approach of the Honda to the guardrail was five degrees. Dr. Yoshida also concluded that the front right tire of the Honda was rolling straight ahead and made contact with the buried end of the guardrail where the guardrail touched the ground. The Honda was traveling in a relatively straightforward direction at the time of initial contact with the guardrail.

The Honda left the roadway while traveling at about 55 mph. After the Honda ramped onto the guardrail, it followed a trajectory toward the utility pole, striking it at a point twenty-seven to forty inches above the ground. Following pole impact, the Honda rotated some 270 degrees in a counterclockwise direction and traveled roughly thirty feet before coming to rest in lane 1. Dr. Yoshida concluded that the path of the Hon-

---

3. We note that the State moved to amend its opening brief to challenge two findings of fact. However, inasmuch as the State's challenge to such findings was untimely, this court denied the State's motion.

da, in leaving the roadway and finally contacting the buried end treatment of the guardrail, was consistent with Leigh looking into his rearview mirror at the pursuing police car and thus not paying attention to the curve in the roadway ahead.

As a result of the accident, Alexa had to be extricated from the car with the "jaws of life." Alexa was taken to the hospital, where she went into respiratory arrest and died shortly after doctors began operating on her. Alexa was pronounced dead by Rex Couch, M.D. (Dr. Couch), who determined that she died from massive intraperitoneal hemorrhage due to traumatic laceration of her portal vein as a consequence of a motor vehicle accident.

At the scene of the accident, officers initially detected signs of life in Darlene, whereas Emergency Medical Personnel detected no signs of life. She was later pronounced dead at the hospital, where it was determined that she died from massive internal hemorrhage due to a tear of her thoracic aorta as a consequence of a motor vehicle accident. Verdoorn sustained numerous abrasions and fractures, but survived the accident. Alan Nahum, M.D. (Dr. Nahum), an expert qualified in Biomechanics, testified as to the manner and severity of Alexa's, Darlene's, and Verdoorn's injuries.

After the accident, a sample of blood was taken from Leigh. Analysis of the sample eight hours after it was drawn indicated a Blood Alcohol Content (BAC) of .13%. Herbert Moskowitz, Ph.D. (Dr. Moskowitz), an expert qualified in Human Factors and Behavioral Toxicology, testified that the level of Leigh's intoxication at the time of the accident was .19% BAC, which would have markedly impaired Leigh's driving ability. In *State v. Leigh*, Cr. No. 94–0027, Leigh was convicted of two counts of Negligent Homicide in the First Degree, one count of Negligent Injury in the First Degree, one count of Driving While License Suspended or Revoked, one count of Conditions of Operation and Registration of Motor Vehicles, and one count of Speed Limit Prohibited.

With respect to the State's liability, the trial court made the following relevant FOFs:

## FINDINGS OF FACT

8. Defendant State of Hawaii ("State") owns and maintains Kuhio Highway, a public highway located in the county of Kauai, including the shoulder areas and guardrails along said highway.

. . . .

61. The guardrail was originally installed sometime between 1969 to 1973. It is located in [sic] near a drainage culvert. It fronts utility pole 116.

62. The 1967 Kuhio Highway improvement construction plans show that the guardrail was intended to be part of the box culvert structure which allows water to drain under the roadway. . . . In order to protect motorists from driving over the culvert head walls into the ditch, a guardrail was designed to be affixed into the head walls to shield the drop-off hazard. This was the purpose of the guardrail.

63. At the time of the accident, . . . the Department of Transportation's policy was . . . that maintenance funds generally could not be used to improve guardrails[.]

. . . .

65. *The guardrail was approximately 110 feet long. The southern portion, or approach end, of the guardrail was buried into the ground at the time of the accident. This treatment is often referred to as a "ramped terminal" or "buried end treatment."*

. . . .

68. *Mr. [Harry] Krueper[, an expert qualified in Highway and Traffic Engineering,] concluded that the guardrail was inadequate in length and end treatment.*

69. *A guardrail at the site of a curve should serve to identify the curve clearly to oncoming drivers.*

70. *Mr. Krueper concluded that the guardrail should have been extended at least an additional 200 feet at the southern end to begin before the curve and thus encompass the full curve. Additionally, the ramped terminal was dangerous and fell below applicable standards.*

71. *Authoritative manuals on highway engineering and roadside conditions pro-*

vide that an appropriate end treatment which would eliminate the problems of ramping or vaulting vehicles is a breakaway cable terminal end treatment ("BCT").

72. Inherent problems with ramped terminals have been commonly known and recognized by transportation and highway officials nationwide for over 20 years and were first recognized in crash testing programs conducted in 1969.

73. The State has, as an authoritative manual in the area of highway engineering, the **Highway Statewide Uniform Design Manual For Streets and Highways** (October 1980, rev. 5/15/86) ("Design Manual").

74. Mr. [Jarvis] Michie[, an expert qualified in Highway Engineering, Guardrail Design, and Collision Performance,] stated that crash tests performed in 1969 on ramped or buried end terminals of guardrails revealed that such terminals would launch and roll impacting vehicles which hit the end of such guardrails.

75. The BCT end treatment was developed in 1973 to 1974, after 1969 crash tests of the buried end treatment revealed ramping problems.

76. The Roadside Design Guide (October 1988), published by The American Association of State and Highway Transportation Officials, and the Design Manual both recognize inherent problems with buried end treatments such as their potential to vault or roll vehicles.

77. Mr. Michie testified that it was inappropriate for the State to have a buried end treatment on the guardrails because such a terminal is not crashworthy. Additionally, the end treatment was located very near the pavement edge and had a high probability of being struck. Finally, the buried end treatment permitted a vehicle to ramp onto the guardrail and strike the fixed object behind the guardrail, which was a large utility pole.

78. Following the accident, the State made modifications and changes to the guardrail.[4] These modifications resulted in a longer, improved guardrail with a different end treatment. The modified guardrail is approximately 324 [feet] in length: approximately 177 feet longer on the southern approach end and approximately 37 feet longer on the northern end of the guardrail.

79. The modified / changed guardrail incorporates a breakaway cable terminal ("BCT") end treatment which does not pose the danger of ramping or vaulting vehicles.

80. The modifications / changes to the guardrail were made with maintenance funds and were done by regular maintenance employees of the Highways Division, Kauai District Office, State Department of Transportation.

81. ... [T]he total cost of those changes was $11,849.83 ($6,660.36 of which was for regular in-house salaried labor).

82. Mr. Krueper concluded that roadside reflectors of either the paddle type or those which are bolted to the guardrail system, were inadequate in placement, quantity, and maintenance. The existing reflectors were not placed in a sequence such that they gave clear delineation to the outside edge and curve of the roadway. They were also badly maintained and covered with soot and dirt, thus reducing their reflective, warning capability.

. . . .

84. Mr. Krueper concluded that the width of the lanes was too narrow. In the resurfacing project, the State eliminated a portion of the shoulders and placed the edge of the traveled way closer to the roadside hazards and barriers. ...

. . . .

86. Mr. Krueper concluded that shoulder widths at the accident site were below applicable standards of highway design.

. . . .

88. The design manual states that existing public streets and highways that do not conform to the design guides are not affected by the Design Manual. However,

4. It should be noted that the State does not presently challenge the admissibility of evidence regarding post-accident modifications to the guardrail.

*the Design Manual provides that any replacement or upgrading made to such streets or highways, or major portions thereof, should conform, where practical, to the design guides contained [t]herein.*

. . . .

91. *In 1990 and 1991, the State improved the Hanamaulu to Wailua Bridge stretch of Kuhio Highway. Although entitled a resurfacing project ("resurfacing project"), the State widened the paved surface of the roadway and added a third lane of travel.*

92. Prior to commencement of the resurfacing project and throughout construction, the State did not reevaluate its roadside operational elements, such as guardrails and roadside reflectors.

93. *The resurfacing project cost $1,133,-390.62 and* caused a number of results: (1) it enlarged the paved portion of the roadway; (2) it restriped the roadway; (3) it changed the usage of the highway, which previously offered only two lanes of travel, by creating a third lane which would be utilized in a contraflow traffic program, thereby improving the capacity of the highway to handle traffic; (4) it *reduced the width of the individual lanes of travel;* (5) it *reduced the size of the shoulders of the roadway; and* (6) it *effectively brought the traveled edge of the roadway closer to the roadside barrier hazards.*

94. *The resurfacing project brought the traffic in lane two 3 and ½ feet closer to the guardrail.* The curvature in the roadway was not materially altered. *The curve was still considered a gentle curve th[r]ough which a motorist would travel at a speed of 55–60 mph, as confirmed by ballbank testing. Also, a speed limit was appropriately set at 50 mph and was also not changed by the resurfacing project.*

. . . .

96. *The nature and scope of work undertaken in the resurfacing project constituted an improvement and upgrading of that portion of Kuhio Highway which was involved in the resurfacing project.*

97. Utilizing the "Roadside 5" computer program, Mr. Michie concluded that *it would have been feasible and extremely cost effective to have improved the guard-*

*rail at least as of the time of the resurfacing project.*

98. *On January 16, 1987, a single motor vehicle accident ("Shaw accident") occurred in the vicinity of the accident.* In the Shaw accident, a car driven by Erika Requilman left the northbound lane of Kuhio highway, traveled between pole 116 and its guy wire, vaulted a drainage ditch, and impacted the north embankment of the ditch. This occurred in the vicinity of mile marker # 4.

99. . . . The guardrail existed at the time of the Shaw accident.

100. *Although the guardrail was not physically impacted in the Shaw accident, the design of the guardrail, including its length and end treatment, was in issue in the determination of the liability against the State of Hawai[']i in the bench trial ("Shaw trial").*

101. *During the Shaw trial, the State's expert witness on highway and traffic engineering, Mr. Edward Ruzak, testified that buried end treatments of guardrails were not, at that time, favored due to potential ramping problems.*

102. The Shaw FOF were prepared by Deputy Attorney General Norma Desantis Titcomb, who represented the State of Hawai[']i in the *Shaw* trial.

103. *The Shaw accident gave the State reasonable prior notice of a prior occurrence under similar circumstances to the accident.*

. . . .

105. Utilizing [a] . . . computer modeling program, *Mr. Michie concluded that the accident would not have resulted in any substantial injuries if an appropriately designed guardrail had been in place.*

106. *Dr. Yoshida testified that, assuming that [the] new guardrail had been in place at the time of the accident, the Honda would have impacted the guardrail at a relatively flat angle of 5 degrees and be[en] easily redirected almost parallel to the guardrail. While some rotational effects to the vehicle might be expected, no rollover would occur, whether the car was traveling 55 or 65 mph.*

. . . .

108. *Given the layout of Kuhio Highway north of the accident's impact site and the fact that there was no oncoming traffic at the time of the accident, no subsequent head on roadside collision would have occurred with the new guardrail.*

. . . .

110. *With a 55 mph impact with the new guardrail,* Dr. Nahum[, the expert qualified in Biomechanics,] concluded that *the injury level for the occupants would be hardly measurable. A 65[mph] impact would still place such an accident below the minor injury potential.*

111. *Dr. Nahum concluded that the injury levels to [Alexa] and the other Honda occupants with the new guardrail would have been subcritical. One would not even expect injury to soft tissues. There would be no fractures or serious, disabling injuries or any need for hospitalization of any of the occupants.*

(Emphases added.)

Based on its extensive FOFs, the trial court apportioned fault between the parties as follows: (1) Leigh—65%; (2) the State—20%; and (3) Alexa, Darlene, and Verdoorn—15%. The trial court made several additional conclusions of law, discussed *infra,* and held the State jointly and severally liable for the Plaintiffs' damages and costs.

Thereafter, the State timely filed the instant appeal.

## II. *STANDARD OF REVIEW*

■■■ It is well-settled that "[i]n cases, such as this, where the fact-finder was the trial judge sitting without a jury, Rule 52(a)[5] of the Hawaii Rules of Civil Procedure requires that his 'findings of fact shall not be set aside unless clearly erroneous.' " *Pacheco v. Hilo Elec. Light Co., Ltd.,* 55 Haw. 375, 384, 520 P.2d 62, 68 (1974); *see*

5. Hawai'i Rules of Civil Procedure Rule 52(a) (1998), in relevant part, states:
 **Findings by the court.**
 (a) **Effect.** In all actions tried upon the facts without a jury . . . the court shall find the facts specially and state separately its conclusions of law thereon. . . . *Findings of fact shall not be set aside unless clearly erroneous, and*

*also State v. Ganal,* 81 Hawai'i 358, 368, 917 P.2d 370, 380 (1996). Moreover, in the negligence and comparative negligence contexts,

*[e]xperience has established . . . that 'proximate cause',[6] 'sole negligence', 'contributory negligence', 'concurring negligence', [and, by extension, 'comparative negligence'] . . . are not absolutes. It is the exceptional case when they can be determined and enforced as a matter of law.*

*Mitchell v. Branch,* 45 Haw. 128, 140, 363 P.2d 969, 977 (1961) (emphasis added) (citation omitted).

■■■ Only "where there is no conflict from the evidence and but one inference can be drawn from the facts, . . . is [it] the duty of the court to pass upon the questions of negligence and proximate cause as questions of law." *Brown v. Clark Equipment Co.,* 62 Haw. 530, 535–36, 618 P.2d 267, 271 (1980); *see also Montalvo v. Lapez,* 77 Hawai'i 282, 290, 884 P.2d 345, 353 (noting that "it is not only appropriate but necessary for the trial judge to properly instruct the jury upon th[e] concept [of proximate causation]" (citation omitted)), *reconsideration denied,* 77 Hawai'i 489, 889 P.2d 66 (1994). Inasmuch as there was conflicting evidence on the issue of legal causation, that question was for the trial judge, sitting as trier of fact. *See Pacheco,* 55 Haw. at 384, 520 P.2d at 68. Further, even though the trial court in the present case deemed its ultimate legal cause finding a conclusion of law (COL), it will not be upset unless clearly erroneous. *See AIG Hawai'i Ins. Co., Inc. v. Estate of Caraang,* 74 Haw. 620, 629, 851 P.2d 321, 326 (1993) (noting that "[w]here conclusions of law present mixed questions of fact and law—that is, where conclusions of law are dependent upon the facts and circumstances of a particular case—we review such conclusions of law"

*due regard shall be given to the opportunity of the trial court to judge of [sic] the credibility of the witnesses.*
(Emphasis added.)

6. Because we prefer "legal cause" over "proximate cause," we use the former, except when quoting directly from a case.

under the clearly erroneous standard (citation omitted)).

■ The trial court's conclusions of law are reviewed under the right/wrong standard. *See Furukawa v. Honolulu Zoological Society*, 85 Hawai'i 7, 12, 936 P.2d 643, 648, *reconsideration denied*, 85 Hawai'i 196, 940 P.2d 403 (1997).

### III. *DISCUSSION*

As stated previously, the State does not challenge any of the trial court's FOFs. Instead, the State challenges five COLs, arguing that: (1) it was under *no* duty to improve the guardrail where the accident occurred;[7] (2) even if it was under a duty to improve the guardrail, (a) its conduct was not a legal cause of the Plaintiffs' injuries or damages, and (b) Leigh's acts were unforeseeable and thus constituted a superseding cause of the accident that relieved the State of liability; (3) the State was immune from liability, pursuant to HRS § 662–15(1), the State Tort Liability Act, for decisions concerning the improvement of the guardrail; and (4) the State did not have reasonable notice of a prior occurrence under similar circumstances and therefore should not have been held jointly and severally liable for the Plaintiffs' damages. Each of the State's arguments is discussed, in order, below.

A. *The Trial Court Did Not Err In Concluding That The State Owed And Breached Its Duty To Improve The Guardrail At The Site Of The Accident.*

1. **The State Owed A Duty To Improve The Guardrail.**

■ Initially, the State recognizes that it has "a general duty to design, construct and maintain its highways and shoulders in a reasonably safe manner." However, the State maintains that its obligation only extends to "people who exercise ordinary care ... [and who] can and do travel over it safely." The Plaintiffs counter that, "when a

defective guardrail design is a substantial factor in the cause of a vehicle accident, [even] negligent drivers and passengers can recover damages from the State under principles of comparative negligence." Plaintiffs are correct.

In the present case, the trial court based its conclusion that the State was "under a duty" to improve the guardrail on the fact that the State's Design Manual required such changes when the State upgraded Kūhiō Highway. The trial court entered the following COL, which the State attacks:

9. The resurfacing project was an upgrade of the Highway. Thus, in accordance with the express language of the Design Manual, the State was under a duty to reevaluate its roadside barrier systems and operational elements, such as the guardrail, at that time, and to modify or change the guardrail so that it conformed to the design manual.

■ The State argues that the Design Manual did *not impose* on the State a duty to improve the guardrail. Nevertheless, even assuming the State's duty did not derive from the Design Manual, this court's prior case law imposes such a duty under the facts of this case.

■ This court has, on numerous occasions, explained the State's duty to maintain its highways:

"The duty of the State is to design and construct its highways in such a manner as to make them reasonably safe for their intended uses, and thereafter to maintain them in a reasonably safe condition." [Citation omitted]. The *State's duty to maintain includes a duty to correct* or inform the public of the existence of *highway defects*. *Breed v. Shaner*, 57 Haw. 656, 665, 562 P.2d 436, 441 (1977). In addition, in *Anders v. State*, 60 Haw. 381, 382, 590 P.2d 564, 567 (1979), this court determined that under Hawaii Revised Statutes (HRS)

---

7. The State offers several alternative arguments in support of its contention that it owed no duty to improve the guardrail. However, some of the arguments actually relate to other elements of

the trial court's decision, *e.g.,* legal causation. To the extent that the State's arguments relate to the existence or non-existence of a duty, they are discussed together *infra*.

[§] 264–43 [8] *the State has a duty* "not only to exercise ordinary care in maintaining the roadway or highway in a reasonably safe condition but *also to keep the shoulders thereof in a reasonably safe condition.*" *See also Terranella v. City & County,* 52 Haw. 490, 479 P.2d 210 (1971).... *The State of Hawaii does have a general duty to design, construct, and maintain its highways and shoulders thereof in a reasonably safe manner.*

*Lagua v. State,* 65 Haw. 211, 214, 649 P.2d 1135, 1137 (1982) (emphases added).

Notwithstanding *Lagua* and the line of cases cited therein, the State contends that its duty extends only to those people who exercise ordinary care. In support of its argument, the State relies heavily upon *Ikene v. Maruo,* 54 Haw. 548, 511 P.2d 1087 (1973), and *Pickering v. State,* 57 Haw. 405, 557 P.2d 125 (1976).

In *Ikene,* a driver was traveling between 40 and 50 mph in a 35 mph zone and missed a curve, resulting in permanent injuries to the plaintiff-passenger. The trial court found the State negligent in failing to maintain its highway properly and held the State responsible for 40 percent of the plaintiff's damages. On appeal, this court reversed, holding that "[t]he *State* did not fail in its duty to keep its highway in a reasonably safe condition, because it *had no obligation to make a highway with a posted speed limit of 35 miles per hour safe for cars speeding in excess of 40 miles per hour.*" *Ikene,* 54 Haw. at 551, 511 P.2d at 1089 (emphases added). In essence, the *Ikene* court held that, whether or not the State could foresee that cars might operate at higher-than-posted speeds, it had no duty to prepare for such a contingency. To the extent that *Ikene* stands for such a proposition, we believe that it was wrongly decided, and we overrule it.

■ This court has, in a variety of contexts, repeatedly recognized a duty owed by all persons to refrain from taking actions that might *foreseeably* cause harm to others. *See, e.g., Tabieros v. Clark Equipment Co.,* 85 Hawai'i 336, 354, 944 P.2d 1279, 1297 (1997) (noting that "it is [t]he legal duty of manufacturers ... to exercise reasonable care in the design and incorporation of safety features *to protect against foreseeable dangers* " (citation and internal quotation marks omitted) (brackets in original) (emphasis added)); *Knodle v. Waikiki Gateway Hotel, Inc.,* 69 Haw. 376, 385, 742 P.2d 377, 383 (1987) ("[U]nder the prevailing rule[,] duty ... is bounded by the foreseeable range of danger, and [r]easonable foreseeability of harm is the very prototype of the question a jury must pass upon in particularizing the standard of conduct in the case before it." (Citing *Bidar v. Amfac, Inc.,* 66 Haw. 547, 552–53, 669 P.2d 154, 159 (1983)) (internal quotation marks omitted) (ellipses in original) (some brackets added)); *Janssen v. American Hawaii Cruises, Inc.,* 69 Haw. 31, 34, 731 P.2d 163, 165 (1987) ("[A] defendant *owes a duty of care only to those who are foreseeably endangered* by the conduct and only with respect to those risks or hazards whose likelihood made the conduct unreasonably dangerous." (Citations and internal quotation marks omitted.) (Emphasis added.)); *Ono v. Applegate,* 62 Haw. 131, 138, 612 P.2d 533, 539 (1980) (holding that consequences of serving liquor to intoxicated driver, such as further inebriation and injurious conduct, were foreseeable intervening acts that would not relieve bar of liability). As discussed more fully *infra,* these same duties apply to the State. *See* HRS § 662–2 (1993) ("The State ... waives its immunity for liability for the torts of its employees and ... [is] liable in the same manner and to the same extent as a private individual under like circumstances[.]").

We recognize that the concept of "duty" involves more than mere foreseeability of harm. *See Thing v. La Chusa,* 48 Cal.3d

---

8. In a footnote, the court noted:
 HRS [§ ] 264–43 provides: "The department of transportation shall construct, maintain, and administer all highways comprising the state highway system." In this case, however, the appellants have not cited this statutory provision as a basis for the State's duty.

*Lagua,* 65 Haw. at 214 n. 1, 649 P.2d at 1137 n. 1. We note that, as in *Lagua,* the parties here do not cite to or rely on HRS § 264–43 (1993), which contains the same language as that quoted *supra.*

644, 257 Cal.Rptr. 865, 771 P.2d 814, 819 n. 3 (1989) (stating, in the context of negligent infliction of emotional distress, that "[a] court's task—in determining 'duty'—is not to decide [merely] whether a particular plaintiff's injury was reasonably foreseeable in light of a particular defendant's conduct, but rather to evaluate more generally whether the category of negligent conduct at issue is sufficiently likely to result in the kind of harm experienced that liability may appropriately be imposed on the negligent party.... Thus, the court's role in deciding whether a 'duty' to these persons should be recognized does not depend solely on ... 'foreseeability' ..., but on ... policy considerations." (Citation omitted.)). However, we disagree with the *Ikene* court's decision limiting the State's duty to the posted speed limit, notwithstanding the fact that the type of harm was manifestly foreseeable in that case.

As noted above, *Ikene* involved the reasonableness of the State's expectation that the *roadway* it constructed would hold a car at a particular speed (35 mph) and not a faster speed (40–50 mph). The court, motivated by a concern that "the State would never be able to ascertain with any certainty exactly how safe beyond the speed limit its highways would need to be made in order to avoid a judgment against it," decided to set the State's duty at the posted speed limit. Although we share the *Ikene* court's concern that the State should not be held liable regardless of a driver's speed or reckless driving, we do not believe that recognizing the State's *duty* to make roads and guardrails safe against the type of harm experienced here, where such harm was "reasonably foreseeable," would subject the State to *liability* for all accidents involving its roads, shoulders, and guardrails.[9] Thus, we overrule *Ikene*, and it poses no bar to the recognition of a duty on the part of the State where it is reasonably foreseeable that a driver would leave the road at mildly excessive speed limits and vault over the defective guardrail.

In *Pickering,* the other case upon which the State heavily relies, the defendant-driver fell asleep at the wheel of the car, jumped over the medial guardrail, entered the opposite-bound traffic lanes, and struck plaintiff's car. The plaintiff sued the State as co-defendant based on its negligent design and construction of the medial guardrails. The trial judge granted the State's motion for summary judgment on the ground that the defendant's falling asleep constituted the sole legal cause of the accident. This court affirmed, stating

[t]he duty of *the State* is to design and construct its highways in such a manner as to make them reasonably safe for their intended uses, and thereafter to maintain them in a reasonably safe condition.... It *is not required to exercise extraordinary care to guard against unusual accidents.*

*Pickering,* 57 Haw. at 409, 557 P.2d at 128 (citations omitted) (emphases added).

Although *Pickering* involved a guardrail-related accident, *Pickering* is not dispositive here because, in that case, there was *"no* evidence which could lead a trier of fact to possibly conclude that the State negligently designed or constructed the medial guardrails[.]" *Lagua,* 65 Haw. at 215, 649 P.2d at 1137 (emphasis added). Here, by contrast, the Plaintiffs presented, and the trial court accepted, evidence demonstrating that the State failed in its duty to "correct or inform the public of the existence of highway defects[.]" *Id.* at 214, 649 P.2d at 1137.

Even if this court accepts the State's argument that, based on *Pickering,* it owes a duty *only* to make the guardrails "reasonably safe for their intended uses," *Pickering,* 57 Haw. at 409, 557 P.2d at 128, and not to "guard against unusual accidents," *id.,* in light of our discussion regarding *Ikene,* we interpret "unusual" to mean "unforeseeable." Thus, under *Pickering,* the State would still owe a

9. We note that engineers design roads to be safe at speeds above the posted speed limit. For example, although the posted speed limit was 50 mph at the site of the accident, the trial court found that, "[t]he curve [where the accident occurred] was ... considered a gentle curve th[r]ough which a motorist would travel at a speed of 55–60 mph, as confirmed by ballbank testing." For policy reasons, therefore, we might not impose on the State a duty to make roads safe beyond the state-of-the-art speed tolerances. But that is not the case here, where there was testimony regarding the high likelihood that the guardrail would be struck and the state's recognition that the preexisting guardrail, if struck, posed dangers of vaulting cars.

duty if the circumstances under which Leigh ran into the guardrail were not so "unusual" as to be unforeseeable. As explained *infra*, it cannot be said that the circumstances surrounding Leigh's crash into the guardrail were so "unusual" that the State could not— or should not—have prepared for them.

As noted previously, the highway had a posted speed limit of 50 mph. The curve was considered a "gentle curve" through which a motorist could safely travel at 55–60 mph. At the time Leigh left the highway, he was traveling at 55 mph. The angle of approach of the Honda to the guardrail was five degrees, and the Honda's right front tire was rolling straight ahead when it hit the buried end of the guardrail. It has been generally known among transportation officials nationwide for over twenty years that guardrails such as the one here cause ramping or vaulting if vehicles hit them at the buried end. The record demonstrates that the State was aware of such problems prior to the accident.

In 1990 and 1991, the State upgraded the road in the vicinity of the guardrail, bringing it even closer to the guardrail. The existing reflectors were not placed in a sequence such that they gave clear delineation to the outside edge and curve of the roadway. Dr. Michie testified that, under conditions existing at the time of the accident, the guardrail had a *high probability* of being struck.

In sum, although Leigh did "miss" the curve in the road due to inattentive driving and drove straight into the buried end of the guardrail, such an occurrence was not "unusual" in the sense that another driver, even one exercising more care, would not have avoided the same result if he or she had left the road at five mph above the speed limit and at the same gentle five degree angle.

This is not a case where a car left the road at a wild angle and at an extraordinary speed. Thus, unlike *Pickering*, there *were* facts in evidence here from which the trial court could have concluded—and implicitly did conclude—that the State failed to comply with its "duty to correct ... highway defects." *Lagua*, 65 Haw. at 214, 649 P.2d at 1137 (citing *Breed v. Shaner*, 57 Haw. 656, 665, 562 P.2d 436, 441 (1977)).

■ Additionally, as noted above, even if the trial court based its conclusion that the State "owed a duty" on an arguably inappropriate basis—the State's Design Manual— this court may affirm a judgment of the trial court on any ground in the record which supports affirmance. *See Enos v. Pacific Transfer & Warehouse, Inc.*, 79 Hawaiʻi 452, 459, 903 P.2d 1273, 1280 (citing *Strouss v. Simmons*, 66 Haw. 32, 40, 657 P.2d 1004, 1010 (1982)), *reconsideration denied*, 80 Hawaiʻi 187, 907 P.2d 773 (1995). The duty imposed on the State in *Lagua*, and the line of cases cited therein, provides such a ground. Moreover, even assuming the State's initial design complied with engineering standards when the guardrail was erected, the additional circumstances—the State's knowledge of the defective condition of the guardrail, the fact that it had the opportunity to repair it when it upgraded the roads in the vicinity, and the fact that, had the guardrail complied with even twenty-year-old engineering standards, it would have lessened the severity of injuries and damages—warrant this court's holding that the State owed a duty to improve the guardrail.[10]

### 2. The State Breached Its Duty To Improve The Guardrail.

■ The State also challenges the following COL of the trial court:

that a "defendant's duty is not to be defined in terms of the plaintiff's conduct[.]" *See also Molbert v. Toepfer*, 550 So.2d 183, 186 (La.1989) ("[T]he Department owes these duties [to design and construct safe curves] not only to prudent and perhaps imprudent and inattentive drivers, but also to their passengers."); *Baudoin v. Acadia Parish Police Jury*, 620 So.2d 453, 456 (La.Ct.App.) ("[T]he parish's duty to maintain its roads in a reasonably safe condition is owed to imprudent motorists as well as non-negligent ones." (Citation omitted.)), *cert. denied*, 626 So.2d 1166 (La.1993).

---

10. In light of this conclusion, the State's reliance on case law from other jurisdictions, particularly Louisiana, for the proposition that it owes a duty only to "reasonably careful drivers," is misplaced. *See Usry v. Louisiana Dep't of Highways*, 402 So.2d 240, 244 (La.Ct.App.) (declining to impose a burden upon the State of having to update all guardrails because, at the time they were constructed, they "met the proper standards"), *cert. denied*, 404 So.2d 1259 (La.1981). As the Plaintiffs point out, cases subsequent to *Usry* undermine the State's position. In *Simpson v. State*, 636 So.2d 608, 612 (La.Ct.App.), *cert. denied*, 637 So.2d 471 (La.1994), the court stated

6. *The State breached its duty of care to the plaintiffs by failing to design, construct and / or maintain the highway and guardrail in a reasonably safe manner / condition and in a manner consistent with accepted standards of highway engineering and roadside design, in that the length and buried end treatment of the guardrail were not reasonably safe.*

(Emphasis added.). Although COL No. 6 is listed in its statement of points of error, the State does not actually argue the "breach" issue. For example, after citing COL No. 6 in its brief, the State argues that "[t]he roadways were never intended to be used by motorists who drive with [Leigh's] level of recklessness. The State should not be held to a legal obligation to prevent an accident caused solely by an intoxicated driver's reckless behavior." Such arguments actually relate to the issue of legal causation, addressed *infra.*

However, insofar as the State specifically includes COL No. 6 in its Points of Error on appeal, the validity of that COL is addressed here. An examination of the trial court's unchallenged FOFs demonstrates that COL No. 6 was proper. As explained *supra,* the FOFs clearly demonstrate that the State knew of the potential vaulting problems and had the opportunity to improve the guardrail when it upgraded the road in the vicinity of the accident. Based on these unchallenged FOFs, the State's knowledge of the defective guardrail, the danger it posed to a driver and passengers who struck it, and the opportunity to improve it, we hold that the trial court did not err in concluding that the State breached its duty of care in failing to design, construct and/or maintain—which includes a duty to "correct" defects in—the highway and guardrail.

B. *The State's Failure To Improve The Guardrail Was A Legal Cause Of Plaintiffs' Injuries And Damages, Which Were Foreseeable.*

1. **The State's Failure To Improve The Guardrail Was A Legal Cause Of Plaintiffs' Injuries And Damages.**

The State argues that "[t]he only cause for the Honda leaving the roadway was the lack of care exercised by the intoxicated driver." The State contends, therefore, that it *cannot* be a legal cause of the Plaintiffs' injuries and damages. The Plaintiffs counter that a negligent party, such as the State, cannot escape liability merely because other causes, *i.e.,* Leigh's inattentive driving, contributed to the Plaintiffs' injuries. The Plaintiffs are correct.

■■■■ This court has long held, in the context of negligence actions, that

[t]he best definition and the most workable test of proximate or legal cause so far suggested seems to be this: "The actor's negligent conduct is a legal cause of harm to another if (a) his [or her] conduct is a substantial factor in bringing about the harm, and (b) there is no rule of law relieving the actor from liability because of the manner in which his [or her] negligence has resulted in the harm." Restatement, Torts, § 431; Prosser on Torts, § 47.

*Mitchell v. Branch,* 45 Haw. 128, 132, 363 P.2d 969, 973 (1961); *see also Aga v. Hundahl,* 78 Hawai'i 230, 236, 891 P.2d 1022, 1028 (1995) (quoting the *Mitchell* test with approval). Under the *Mitchell* test, a

*defendant's negligence need not have been the whole cause or the only factor in bringing about the harm. It was enough that his [or her] negligence was a substantial factor in causing plaintiff's injuries.*

*Knodle,* 69 Haw. at 390, 742 P.2d at 386 (citation, internal quotation marks, and brackets omitted) (emphases added).

■■■■ As this court explained in *McKenna v. Volkswagenwerk Aktiengesellschaft,* 57 Haw. 460, 558 P.2d 1018 (1977):

Th[e *Mitchell* ] test represents a realistic approach to problems of causation, an area which has long been complicated by a failure to distinguish between questions of fact and policy concerns. The *first arm* of the test contemplates a factual determination that the negligence of the defendant was more likely than not a substantial

factor in bringing about the result complained of. *See Prosser on Torts* § 41 (4th ed.1971).....

The *second arm* of the *Mitchell* test contemplates inquiry whether there are policy concerns or rules of law that would prevent imposition of liability on the negligent party although his negligence was clearly a cause of the resultant injury....

*Id.* at 464–65, 558 P.2d at 1022 (emphases added). Moreover, "[w]here there is conflicting evidence, as there is in this record, on the issue of proximate causation, the question is one for the trier of fact." *Mitchell*, 45 Haw. at 139, 363 P.2d at 977 (citations omitted).

▓▓▓▓ Applying the first arm of the *Mitchell* test to this case, it cannot be said the trial court clearly erred in concluding that the State was 20% liable. As noted previously, the State does not construct guardrails with the reasonable expectation that no driver will ever leave the road and strike them. Moreover, the circumstances under which Leigh's car left the road and struck the guardrail were not so "unusual" that another driver, exercising more care, would not have avoided the same result if he or she had left the road. Indeed, one of the experts testified that, under conditions existing at the time of the accident, the guardrail had a high probability of being struck. The question therefore is whether a "reasonably safe" guardrail, under the circumstances, would have prevented or at least lessened the ultimate harm here.

The trial court found that: (1) experts believed the guardrail was inadequate in length and end treatment; (2) the guardrail should have been extended at least an additional 200 feet at the southern end to begin before the curve and thus encompass the full curve; (3) the ramped terminal was dangerous and fell below applicable standards; (4) experts concluded that the roadside reflectors were inadequate in placement, quantity, and maintenance and did not give a clear delineation to the outside edge and curve of the roadway; and (5) experts also concluded that the width of the lanes were too narrow and that the State's elimination of a portion of the shoulders rendered them below applicable standards of highway design at the site of the accident. Based on these FOFs, the State was clearly a "substantial factor in bringing about the result complained of." *McKenna*, 57 Haw. at 464, 558 P.2d at 1022.

The State contends, however, that it cannot be a legal cause of the Plaintiffs' injuries because "Leigh's inattentive driving was the only substantial factor that caused the Honda to leave the Highway." [11] Nevertheless, when viewed in context of the trial court's other FOFs and COLs, it becomes clear that COL No. 8 does not carry the dispositive force the State contends. First, COL No. 8 focuses on the reasons why the Honda *left the highway*—it does not state that Leigh's inattentive driving was the *only* substantial cause of the *ultimate harm*. *See Simpson v. State*, 636 So.2d 608, 612 (La.Ct.App.1993) (Rejecting an argument that the defective condition of a bridge was not the cause of the driver losing control of his vehicle, the court stated, "[w]e find such an analysis of causation questionable.... *[T]he actions of the driver **and** the inaction of [the State] combined to cause the event.*" (Underscored and bold emphases added.)), *cert. denied*, 637 So.2d 471 (La.1994).

Based on the foregoing, under the first arm of *Mitchell*, the State could still be deemed a "substantial factor" in bringing about the result complained of, *i.e.*, the injuries to the Plaintiffs. Although the trial court did not use the "substantial factor" language in attributing liability to the State, it unambiguously concluded that "[t]he negligence of the State was 20% of the proximate ... cause of the accident which resulted in plaintiffs' injuries and damages." In light of the unchallenged FOFs discussed *supra*, it cannot be said that such a conclusion was clearly erroneous.

11. The State also makes several other factual assertions contradicting the trial court's FOFs. For example, the State asserts that the "sole reason for the Honda leaving the roadway was the high level of intoxication impairing the driver's ability to operate the vehicle." To the extent that such assertions differ from the trial court's FOFs, they must be rejected insofar as the State, as previously indicated, has failed to challenge any of the FOFs.

As for the second arm of *Mitchell*, additional FOFs militate against this court finding "policy concerns ... that would prevent imposition of liability on the [State]." *McKenna*, 57 Haw. at 465, 558 P.2d at 1022. Because such policy issues necessarily entail inquiry into questions of foreseeability and superseding causation—distinct issues raised by the State—they are addressed separately in the next section.

### 2. Leigh's Acts Were Not Unforeseeable And Did Not Constitute A Superseding Cause Relieving The State Of Liability.

The second arm of the *Mitchell* test requires this court to focus "on whether the intervening actions of [Leigh] in the chain of causation relieved the [State] from liability." *McKenna*, 57 Haw. at 465, 558 P.2d at 1022. On this point, the State argues that it "should not be held to a legal obligation to prevent an accident caused solely by an intoxicated driver's reckless behavior." The State also contends that "the trial record does not show any prior accidents involving ramping or vaulting of vehicles on buried end treatments." Neither contention leads us to conclude that the State should be relieved of liability.

Regarding the State's first point of contention, it is important to initially point out that,

> [i]t is a rare case where the court may hold, as a matter of law, that the intervening act breaks the chain of causation because whether it was reasonably foreseeable is a question of fact and not of law. *The second act will break the chain of causation only where, under no rational interpretation of the evidence, could the later act of negligence have been reasonably foreseen.*

*McKenna*, 57 Haw. at 466, 558 P.2d at 1023 (citation and internal quotation marks omitted) (emphasis added). As this court has explained, "driving ... while under the influence of intoxicating liquor does not constitute actionable negligence or contributory negli-

gence *unless* there is a causal relationship between the intoxication and the accident." *Id.* at 467, 558 P.2d at 1024 (emphasis added).

As noted previously, the trial court did make certain findings regarding Leigh's level of intoxication. Contrary to the State's contention, however, the trial court did *not* find or conclude that the accident was *caused solely* by Leigh's intoxicated driving and/or reckless behavior. Notwithstanding the trial court's conclusion that Leigh's inattentive driving caused the Honda to leave the highway, the trial court also found additional facts leading it to conclude that the State's negligence was 20% of the legal cause of the Plaintiffs' injuries and damages.

Specifically, in addition to the FOFs discussed *supra*, the trial court found that: (1) the State's resurfacing project on Kūhiō Highway, among other things, reduced the width of the individual lanes of travel, reduced the size of the shoulders of the roadway, and effectively brought the traveled edge of the roadway closer to the roadside barrier hazards; (2) experts concluded that it would have been feasible and extremely cost effective to have improved the guardrail at least as of the time of the resurfacing project; and, perhaps most important, (3) experts concluded that the accident would not have resulted in any substantial injuries had an appropriately designed guardrail been in place. In light of these unchallenged FOFs, it cannot be said that the trial court erred in its conclusion that Leigh was not the sole legal cause of the Plaintiffs' injuries and damages. *See Simpson*, 636 So.2d at 612 (stating that, in one-car accident, "the actions of the driver *and* the inaction of [the State] combined to cause the event" (emphasis added)).

Regarding the State's second contention—that the accident was unforeseeable because it did not have notice of prior accidents—the trial court made the following relevant findings: (1) On January 16, 1987, a single motor vehicle accident (the Shaw accident) [12] occurred in the vicinity of the subject

---

12. As with post-accident modifications to the guardrail, we note that the State does not specifi-

cally challenge, under Hawai'i Rules of Evidence (HRE) Rule 403 or any other basis, the *admissi-*

accident, wherein a car left the northbound lane of Kuhio highway, traveled between pole 116 and its guy wire, vaulted a drainage ditch, and impacted the north embankment of the ditch in the vicinity of mile marker # 4; (2) although the guardrail was not physically impacted in the Shaw accident, *the design of the guardrail, including its length and end treatment, was in issue in the determination of the liability against the State in the bench trial* (the *Shaw* trial); (3) during the *Shaw* trial, *the State's expert witness on highway and traffic engineering, Mr. Edward Ruzak, testified that buried end treatments of guardrails were not, at that time, favored due to potential ramping problems;* and (4) the Shaw accident gave the State reasonable prior notice of a prior occurrence under similar circumstances to the accident.

Thus, as the State contends, it may be true that there were no accidents involving the exact same circumstances or this particular guardrail. However, in light of the *Shaw* trial, the particular improvements of Kūhiō Highway in the vicinity of the guardrail and the State's uncontroverted knowledge of potential ramping problems associated with guardrails of this type, we hold that Leigh's actions were "reasonably foreseeable" and therefore not the sole legal cause of the Plaintiffs' injuries and damages.

C. *The State Was Not Immune From Liability, Pursuant To HRS § 662–15(1) (1993).*

■ Under HRS § 662–2 (1993), "[t]he State . . . waives its immunity for liability for the torts of its employees and . . . [is] liable in the same manner and to the same extent as a private individual under like circumstances[.]" Notwithstanding this general

waiver of immunity, the State Tort Liability Act contains the following exception for

[a]ny claim based upon . . . the *exercise or performance or the failure to exercise or perform a discretionary function or duty on the part of a state officer or employee, whether or not the discretion involved has been abused* [.]

HRS § 662–15(1) (emphasis added). The highlighted portion of section 662–15(1) is generally referred to as the "discretionary function exception," and, if a government actor's decision or conduct falls within that exception, he or she will be immune from liability. In the present case, the State contends that the decision to not improve the condition of the guardrail constituted a "discretionary function" for which the State and its employees are immune from liability.

■ In describing State immunity, this court has stated,

Sovereign immunity for the performance of discretionary functions is retained to protect the decision-making processes of state officials and employees which require evaluation of broad public policies.

*Nakahira v. State,* 71 Haw. 581, 583, 799 P.2d 959, 961, *reconsideration denied,* 71 Haw. 665, 833 P.2d 899 (1990) (citations omitted). . . . "The demarcation line . . . between a discretionary function and an operational level activity is not so easily drawn, and the determination, therefore, must ordinarily be made in the factual context in which the issue has arisen." *Julius Rothschild & Co. v. State,* 66 Haw. 76, 80, 655 P.2d 877, 881 (1982).

*Tseu ex rel. Hobbs v. Jeyte,* 88 Hawai'i 85, 88, 962 P.2d 344, 347 (1998) (emphasis omitted). Thus, our cases make clear that, in deciding whether actions of State officials fall within

bility of the Shaw accident records to establish foreseeability. As such, any argument to the contrary was waived. *See Kawamata Farms, Inc. v. United Agri Products,* 86 Hawai'i 214, 252, 948 P.2d 1055, 1093 (1997) ("If a finding is not properly attacked, it is binding; and any conclusion which follows from it and is a correct statement of law is valid." (Citation omitted.)). Even if the State had argued that the Shaw accident was too remote from or insufficiently similar to the present circumstances, it would not have constituted an abuse of discretion for

the trial court to consider it here because proffered evidence of prior accidents is considered under a " 'much relaxed' standard applicable *when admission is sought on the ground that the prior accidents should have attracted the [State's] attention to a potentially dangerous condition." Kaeo v. Davis,* 68 Haw. 447, 457, 719 P.2d 387, 393 (1986). The State does, however, challenge the trial court's ultimate conclusion that the Shaw accident placed the State on sufficient notice to serve as a basis for joint and several liability under HRS § 663–10.9(4). *See infra* Section III.D.

the discretionary function exception, this court must "determine whether the challenged action involves the effectuation of a 'broad public policy[,]'on the one hand, or routine, 'operational level activity[,]' on the other." *Id.*

■ This court has previously discussed these principles in a case involving the design of State highways. *See Breed v. Shaner,* 57 Haw. 656, 562 P.2d 436 (1977). In *Breed,* this court explained that "operational level acts are those which concern routine, everyday matters, not requiring evaluation of broad policy factors." *Id.* at 666, 562 P.2d at 442. This court went on to illustrate the types of decisions that "require evaluation of broad policy factors by their very nature, *e.g.,* a decision to purchase certain aircraft, a decision to activate an airbase, or a decision not to build a prison." *Id.* at 667, 562 P.2d at 443 (footnotes omitted). In contrast, matters such as "the kinds of road signs to place and where to place them, and which center line stripings to repaint and when to repaint them d[o] not require evaluation of policies but involve[ ] implementation of decisions made in [the] everyday operation of governmental affairs." *Id.* at 666, 562 P.2d at 442. With these precepts in mind, we turn to the present case.

■ The State relies heavily on this court's decision in *Julius Rothschild,* where this court held that the decision not to reconstruct the Moanalua Stream Bridge constituted a discretionary function involving a "weighing of priorities at the higher levels of government, and . . . surely entail[ing] evaluations based on financial, political and economic considerations." 66 Haw. at 80–81, 655 P.2d at 881. The State contends that the decision to improve guardrails, like the decision not to reconstruct a bridge in *Julius*

*Rothschild,* involves the evaluation of broad policy considerations.

The Plaintiffs correctly point out, however, that the project at issue in *Julius Rothschild* involved "a costly reconstruction or replacement of a two-span permanent concrete structure," requiring approval by the legislature and governor. *See id.* at 80–81, 655 P.2d at 881. In contrast, the post-accident upgrade of this single Kaua'i guardrail cost $11,849.83 in maintenance funds and could have easily been folded into the much more expensive resurfacing project, which cost $1,133,390.62, already underway in 1991.

More fundamentally, the State had already established a policy on guardrails, which was reflected in its Design Manual. As the State itself concedes, *"under the department's policy, the contemporary engineering standards [for guardrails] would be applicable to existing streets and highways at a time when such roadways are either 'replaced' or 'upgraded.' "* (Emphasis added.) Thus, at the time the roadway was "upgraded," the State's own policy indicated that the guardrails should have been brought into compliance with contemporary engineering standards, *i.e.,* a change in the guardrail's end treatment and length. The trial court specifically found that the resurfacing project constituted an "upgrade." At that point, the decision not to improve the guardrail constituted an "operational level" decision and not a "broad public policy" decision protected under the "discretionary function exception" of the State Tort Liability Act. Any arguments that the trial court erred in its determination that the resurfacing project *in this case* was an "upgrade" are foreclosed by the State's failure to challenge the pertinent FOFs.[13]

---

13. The State cites cases from other jurisdictions suggesting that the decision to upgrade out-of-date guardrails constitutes a "discretionary function," rendering the State immune from suit. *See City of El Paso v. Ayoub,* 787 S.W.2d 553 (Tex.App.1990); *Keegan v. State,* 896 P.2d 618 (Utah 1995). As the Plaintiffs point out, however, these cases do not reflect Hawai'i law. The *Ayoub* court utilized a "governmental purpose" versus "proprietary purpose" analysis that differs from Hawaii's approach to questions of immunity. In *Keegan,* the decision not to raise a concrete barrier came after careful cost/benefit anal-

ysis by the state's Department of Transportation engineers, who concluded that there would be no adverse impact on safety. By contrast, in the present case, the trial court specifically found that, "[p]rior to commencement of the resurfacing project and throughout construction, the State did not reevaluate its roadside operational elements, such as guardrails and roadside reflectors." Thus, unlike *Keegan,* the decision not to upgrade the guardrail here cannot be deemed "the result of serious and extensive policy evaluation." Moreover, to the extent that "policy eval-

The conclusion that the "discretionary function" exception does not apply here is further supported by at least three decisions of this court. *See Nakahira v. State*, 71 Haw. 581, 586, 799 P.2d 959, 962 (holding that the "implementation" of a training program, as opposed to the adoption of the program, "is not a discretionary function under the State Tort Liability Act"), *reconsideration denied*, 71 Haw. 581, 799 P.2d 959 (1990); *Breed*, 57 Haw. at 667, 562 P.2d at 443 ("[D]ecisions made in designing a highway do not always fall in [the broad public policy] category. A curve may be placed in a road to simply get around an obstacle."); *Rogers v. State*, 51 Haw. 293, 296, 459 P.2d 378, 381 (1969) (Rejecting the State's argument that placement of road signs and stripes constitutes a discretionary function, the court stated, "[i]n a strict sense, every action of a government employee ... involves the use of some degree of discretion." (Citation omitted.)).

Accordingly, we hold that the decision not to improve the guardrail, at the time of the resurfacing project of Kūhiō Highway, constituted an operational level decision that did not fall within the "discretionary function" exception.

D. *The Trial Court Did Not Err In Concluding That The State Was Jointly And Severally Liable For The Plaintiffs' Damages.*

Finally, the State complains that the trial court erred when it concluded that "[t]he State had prior notice of the dangerous condition, the ramping / vaulting potential of the guardrail's buried end treatment, by the Shaw accident, which was a prior occurrence under similar circumstances to the accident pursuant to HRS § 663–10.9 (1995)[14]." In particular, the State contends that the Shaw accident "was clearly not a similar prior occurrence to the accident involved in this appeal[ and, f]urther, the ensuing litigation did not place the State of Hawaii on reasonable notice that the roadway or guardrail was unreasonably dangerous." These contentions lack merit.

HRS § 663–10.9 (1993) provides that:

**Abolition of joint and several liability; exceptions.** *Joint and several liability for joint tortfeasors ... is abolished except in the following circumstances:*

. . . .

(4) *For recovery of noneconomic damages in motor vehicles accidents involving tort actions relating to the maintenance and design of highways including actions involving guardrails[ ] ... upon a showing that the affected joint tortfeasor was given reasonable prior notice of a prior occurrence under similar circumstances to the occurrence upon which the tort claim is based. . . .*

(Bold emphasis in original.) (Underscored emphases added.)

 Moreover, the legislative history of this provision explains that: "It is the intent ... that the prior occurrence be at the same location as the occurrence on which the tort claim is based *but the term 'similar circumstances' is not intended to mean that a prior occurrence need be identical or exactly similar but instead be generally the same.*" Sen. Spec. Comm. Rep. No. S5-86, in 1986 Special Session Senate Journal, at 28–29 (emphasis added). Thus, it is clear that the prior occurrence need *not* be precisely the same, but that HRS § 663–10.9(4) allows tort victims to recover fully from the State, as a joint tortfeasor, where it had "reasonable prior notice" of the dangerous condition.

 In the instant case, the trial court found the following facts: (1) the Shaw accident, which occurred on January 16, 1987, occurred in the vicinity of the subject accident; (2) the same guardrail at issue here

---

uation" was involved in the present case, the State, in its Design Manual, expressed a policy favoring replacement of buried end treatments when roads are "upgraded." It was not a discretionary function, therefore, when the maintenance crew did *not* implement that policy here.

14. Although the trial court cites the 1995 version of HRS § 663–10.9, the section was repealed on October 1, 1995. Inasmuch as the accident giving rise to the State's liability occurred in February 1994, we rely on the 1993 version of section 663–10.9, which was then in force.

existed at the time of the Shaw accident; (3) although the guardrail was not physically impacted in the Shaw accident, the design of the guardrail, including its length and end treatment, was in issue in the determination of the liability against the State in the *Shaw* trial; and (4) during the *Shaw* trial, the State's own expert witness on highway and traffic engineering testified that buried end treatments of guardrails were not, at that time, favored due to potential ramping problems.

Moreover, as the Plaintiffs point out, FOF No. 21 from the *Shaw* trial states that, "[b]ecause the buried end treatment permits a vehicle to 'ramp' on the guardrail, current engineering practices favor a flared end treatment for guardrails, which would have lengthened the existing guardrail near Mile # 4 another 1–2 feet." Based on the FOFs in the instant case and *Shaw* FOF No. 21, which the State prepared, the trial court did not clearly err when it found that the State had "reasonable prior notice of a prior occurrence under similar circumstances to the accident." Although it is true that there was no causal relationship between the guardrail and the accident in *Shaw*, an identical accident was not required to put the State on "reasonable prior notice." *See* Sen. Spec. Comm. Rep. No. S5–86, in 1986 Special Session Senate Journal, at 28–29 ("[A] prior occurrence need [not] be identical or exactly similar[.]"). It is enough that the State knew of the particular defective guardrail, had an opportunity to correct it, and failed to do so.

Accordingly, we hold that the trial court did not err in holding the State jointly and severally liable for the injuries and damages of the Plaintiffs in this case.

## IV. *CONCLUSION*

For the foregoing reasons, we affirm the decision and order of the trial court.