**Electronically Filed
Intermediate Court of Appeals
CAAP-16-0000011
30-SEP-2021
10:20 AM
Dkt. 102 MO**

NO. CAAP-16-0000011

IN THE INTERMEDIATE COURT OF APPEALS

OF THE STATE OF HAWAI'I


RAEVYN WAIKIKI,
Plaintiff-Counterclaim-Defendant/Appellee,
v.
HO'OMAKA VILLAGE ASSOCIATION OF APARTMENT OWNERS,
Defendant/Cross-Claim Plaintiff/Appellee,
and
VIOLET JHUN,
Defendant/Cross-Claim Defendant/Counterclaim Plaintiff/
Third-Party Plaintiff/Appellant,
and
WADE KIOSHI KALEOLANI SHIMOJO,
Third-Party Defendant/Appellee,
and
DOE DEFENDANTS 1-20, Defendants


APPEAL FROM THE CIRCUIT COURT OF THE FIRST CIRCUIT
(CIVIL NO. 13-1-2391-09)


MEMORANDUM OPINION
(By:  Ginoza, Chief Judge, Leonard and Wadsworth, JJ.)

## I.  Introduction

In this tort case involving injuries from an altercation involving three dogs and two individuals, Defendant-Third Party Plaintiff-Appellant Violet Jhun (**Jhun**) appeals from the "Final Judgment" entered on August 11, 2017, by the Circuit

Court of the First Circuit (**Circuit Court**),[1] in favor of Third Party Defendant-Appellee Wade Shimojo (**Shimojo**).  Jhun challenges the underlying "Order Granting [Shimojo's] Motion for Summary Judgment Filed March 6, 2015" (**Order Granting Summary Judgment**) entered on June 18, 2015, by the Circuit Court.[2]

This case is currently before us on remand from the Hawaiʻi Supreme Court after we dismissed Jhun's appeal for lack of jurisdiction because the Circuit Court had not entered a separate final judgment disposing of all claims as to all parties.  Waikiki v. Hoʻomaka Vill. Ass'n of Apt. Owners, 140 Hawaiʻi 197, 204, 398 P.3d 786, 793 (2017).  The Hawaiʻi Supreme Court remanded the case to our court with instructions to issue an order for temporary remand to the Circuit Court for entry of a final appealable judgment, and then for us to address the merits of Jhun's appeal.  Id.  Thus, in light of the Hawaiʻi Supreme Court's opinion, and the Final Judgment entered thereafter on temporary remand to the Circuit Court, we address Jhun's appeal on the merits.

This action arises from an incident on September 30, 2011, in which Jhun's two dogs got loose from her apartment and an altercation resulted in injuries to Jhun's neighbor Raevyn Waikiki (**Waikiki**) and Waikiki's dog (**Sophie**).  On September 4, 2013, Waikiki initiated this action by filing a Complaint against, *inter alia*, Jhun asserting that Jhun's negligence, gross negligence and/or recklessness resulted in serious injuries to Waikiki and Sophie.[3]

---

[1]  The Honorable Gary W.B. Chang presided in entering the Final Judgment filed on August 11, 2017.

[2]  The Honorable Karl K. Sakamoto presided with regard to Shimojo's motion for summary judgment and entered the Order Granting Summary Judgment.

[3]  Waikiki's Complaint also named Hoʻomaka Village Association of Apartment Owners (**Hoʻomaka Village**) as a defendant, alleging that prior to the September 30, 2011 incident, Waikiki and other tenants had complained about Jhun's dogs to Hoʻomaka Village's resident manager, employees, agents or representatives, Hoʻomaka Village knew or should have known the dogs were dangerous and a hazard to the community, but that Hoʻomaka Village failed to

(continued...)

In turn, on November 15, 2013, Jhun filed a Third Party Complaint against Shimojo, alleging that Shimojo was an owner of Sophie and that his conduct in the year prior to the September 30, 2011 incident had caused the incident.  In the Third Party Complaint, Jhun alleges, *inter alia*, that: she also sustained injuries during the subject incident when she tried to break up the dog fight and Sophie bit her; for approximately one year prior to the incident Shimojo and Sophie teased, taunted and provoked Jhun's dogs; and "[s]aid injury, damages and attorneys fees and potential adverse judgment were or will all be the result of the wrongful, intentional, willful, reckless or negligent conduct of SHIMOJO in teasing, taunting and provoking JHUN'S dogs for approximately one year prior to September 30, 2011."

This appeal concerns the Circuit Court's grant of summary judgment in favor of Shimojo and against Jhun related to Jhun's Third Party Complaint against Shimojo.

On appeal, Jhun raises a single point of error and argues that the Circuit Court erred in granting summary judgment in favor of Shimojo because Shimojo owed Jhun a duty of ordinary care under the facts of this case, and assuming there is a duty of care, Jhun argues there is ample evidence in the record that Shimojo breached his duty to Jhun by taunting, teasing, and provoking Jhun's dogs, and there is ample evidence that the breach resulted in injuries to Jhun.

Given the evidence and undisputed material facts of this case, we conclude Shimojo did not owe a legal duty to Jhun under the circumstances here as to the conduct that Jhun asserts against Shimojo.  The Circuit Court properly entered summary judgment in favor of Shimojo, and thus we affirm.

---

[3](...continued)
remove Jhun's dogs or take action to protect the residents.

## II.  Background

### A.  Factual Background and Evidence

The pertinent facts in this case are not in dispute. Waikiki and Jhun were neighbors in the Hoʻomaka Village apartment complex in Waipahu, Hawaiʻi.  On September 30, 2011, as Waikiki returned to her apartment from walking Sophie, Jhun's two dogs got loose from Jhun's apartment and attacked Sophie in the common area of Hoʻomaka Village.[4]  One of Jhun's dogs is a pitbull breed

---

[4]  The Complaint at paragraphs 8-10 alleges:

> 8.  On or about Friday, September 30, 2011 at approximately 6:30 p.m., Plaintiff had been walking her dog, Sophie, in the common area of Hoʻomaka Village and was just returning home to her apartment. As she was proceeding to unlock her front door, her neighbor, Defendant VIOLET JHUN, opened her front door and let loose her Pitbull dog into the common area without a leash. Said Pitbull ran over and viscously attacked Plaintiff RAEVYN WAIKIKI in the Hoʻomaka Village common area.
>
> 9.  At said time and place, Defendant VIOLET JHUN failed to get control of her Pitbull dog and, in fact, proceeded to let her Rottwieller [sic] dog out into the common area without a leash. Said Rottwieler [sic] ran over and viscously attacked Sophie, Plaintiff RAEVYN WAIKIKI's dog, in the Hoʻomaka Village common area.
>
> 10.  At said time and place, Sophie, Plaintiff RAEVYN WAIKIKI's dog, ran away from the common area in front of her apartment and the Defendant VIOLET JHUN's two violent dogs chased Sophie and attacked her further on the grounds of the Hoʻomaka Village.

In her Answer to the Complaint, Jhun responded in relevant part as follows:

> 6.  With respect to the allegations in Paragraph 8 of the complaint, JHUN admits that on or about Friday, September 30, 2011 at approximately 6:30 p.m., WAIKIKI was walking her dog, Sophie, in the common area of Hoʻomaka Village and that JHUN'S pitbull dog, Kaltuchu [sic], got loose into the common area without a leash. JHUN denies that Kaltuchu [sic] attacked WAIKIKI at such time and place or at any other time or place. JHUN denies that she opened her door and let Kaltuchu [sic] loose. JHUN is without knowledge sufficient to form a belief as to the truth of the remaining allegations there.
>
> 7.  With respect to the allegations of Paragraph 9 of the complaint, JHUN admits that her Rottweiler dog, Nala, also got loose without a leash in the common area and got into a fight with WAIKIKI'S dog Sophie. JHUN denies that she "let her Rottweiler out" and denies that she "failed to control her pitbull."
>
> 8.  With respect to the allegations of Paragraph 10 of the complaint, JHUN admits that Nala and Kaltuchu [sic] got into a fight with Sophie in the common area adjacent to WAIKIKI and

(continued...)

4

of dog and the other is a rottweiler breed of dog.  Sophie is a pitbull mix breed of dog.  Waikiki, Sophie, and Jhun were injured as a result of the incident.  At the time, Shimojo lived with Waikiki and Sophie, but was not present when the incident occurred.

Jhun already had her two dogs when Shimojo and Waikiki got Sophie.  Jhun suggested to Shimojo that the dogs should be socialized and get to know each other.  Shimojo declined to socialize Sophie with Jhun's dogs.

To specify the circumstances under which Jhun asserts Shimojo had a legal duty in this case, portions of Jhun's deposition testimony were submitted in support of Shimojo's summary judgment motion.  Relevant portions of Jhun's testimony addressed how Shimojo played with Sophie and allegedly irritated Jhun's dogs, as follows:

> Q.    Okay, thank you.  And he would say something to Sophie like "good girl" or something like that while he was playing with Sophie?
>
> A.    He would make noises.
>
> Q.    When you say "make noises," like –-
>
> A.    "Huh, come on, girl, huh, come on, come on."  Like that.
>
> Q.    So: Come on girl, huh, huh, come on girl?
>
> A.    Huh, he make football like this. (Witness indicating.)
>
> Q.    And then clap his hands?
>
> A.    He'd clap his hands like that. (Witness indicating.)
>
> Q.    And he would do that with Sophie about how often?
>
> A.    Daily.
>
> Q.    Like once a day?
>
> A.    Daily, after when he comes home from work.
>
> Q.    And about what time, 4 clock [sic], 5 o'clock?

---

[4](...continued)
    SHIMOJO'S and JHUN'S apartments.

(Emphasis added)

A.    Around there.

Q.    And he'd do it for, what, about?

A.    Days turn into weeks, week[s] turn into months.

Q.    So this was a routine, a regular play routine that Wade had with Sophie; is that correct?

A.    Seemed like it, yes.

Q.    And when they played it would be, what, half an hour, 20 minutes, about how long would they play like that?

A.    15, 20 minutes.

Q.    Okay, 15, 20 minutes. Is it Ms. Jhun?

A.    You can call me Violet.

Q.    So, Violet, in this legal pleading you filed, called a third-party claim, you **allege that Wade was teasing, taunting and provoking your dogs for approximately one year prior to September 30th, 2011.  When you said that, this is what you're talking about, Wade playing with Sophie**.

A.    **Yeah**, and he would look up and laugh.

Q.    So while Wade was playing with Sophie he would look up and laugh.

A.    He would look up and laugh.

Q.    About how many times would he look up and laugh during that 15 minutes?

A.    Especially if I was on the back lanai.

Q.    So if you are on the back lanai he would look up and laugh?

A.    He'd go -- (Witness indicating.)

Q.    As he would say: Go girl, go girl, he would look up at you and laugh?

A.    Yeah, and my dogs would be going -- (witness indicating.) -- like animals in a cage, like back and forth. (Witness making whimpering sound.)  Kaltochu would do that.

Q.    Pardon me?

A.    Kaltochu would do that.  Yeah, he still had a puppy mind, you know, wanted to play.

Q.    So Kaltochu wanted to play.  Was he in a cage when he would go back and forth?

A.    No.

Q.    He was on the lanai.

A.    Yes.

Q.    So during that year approximately how many times were you on the lanai and you saw Wade playing with Sophie on the grassy area?

A.    Whenever I saw my dogs whimpering, my dog whimpering, and you can hear his nails on the floor on the lanai, which you can hear it, yeah, especially if you're movable in the house you can hear it, so I go out and investigate to see why they're doing that, and then I would see that.

Q.    So Kaltochu would be kind of pacing on the lanai while Wade was --

A.    And looking.

Q.    -- and looking.  But Kaltochu wasn't barking?

A.    No, just -- (Witness making whimpering sound.) -- like that.

Q.    Yeah, just kind of making a little "hmph," what do we call it?

A.    No, like a whimp, like he was anxious, like he wanted to play kind of thing, looked like.

Q.    So it wasn't a mean sound that Kaltochu was making, it was just kind of like a, you know, just kind of regular, you know, doggie noise that he wanted to play also.

A.    Yes, and I would go out and investigate, and that's when -- (Witness indicating.)

Q.    So this would go on.  **So in that third-party claim, paragraph 12, when you say that Wade was teasing, taunting, provoking the dogs, that's what you're talking about, the playing with Sophie on the grassy area, correct?**

A.    **Yes.**

Q.    Okay, thank you.

(Emphasis added).

In her Memorandum in Opposition to Shimojo's Motion for Summary Judgment, Jhun attached her declaration which states in relevant part:

9.  [E]very day for approximately one year prior to the [dog] fight, [Shimojo] would play with Sophie on the common area lawn just below my lanai where I kept [my dogs].

10.  During this time, [Shimojo] would make sounds and gestures that annoyed [my dogs].  [My dogs] would begin

pacing and whining and got extremely agitated.

11.  I complained to [Shimojo] about him doing this as it was irritating my dogs and [Shimojo] only laughed.

12.  I put up a barrier on my lanai to obscure the dogs [sic] view, but they were still irritated by the sounds.

13.  When I was walking my dogs, [Shimojo] and [Waikiki] allowed Sophie to bark aggressively at [my dogs] from within their apartment.

14.  This would cause my dogs to react aggressively as well.

In Shimojo's Reply Brief, he attached further portions of Jhun's deposition transcript, including where she testified as follows:

Q.    What about Wade Shimojo, have you ever talked to Wade Shimojo about the dog bite incident?

A.    Yes.

Q.    When did you talk to him?

A.    The day after.

Q.    Tell me what both of you said.

A.    I apologized to him, and I told him that any doctor bills for Sophie, that if he could, you know, let me know how much it is because I wouldn't wish it upon my worst enemy, to -- whatever happened to Sophie.  So he showed me pictures of her on his phone.

Q.    Anything else?

A.    Yes.  And I told him that I wanted to speak with Raevyn, you know, to see how she was.

Q.    So you offered to pay for Sophie's vet bills?

A.    For whatever bills, yeah, necessary that was involved in this.

Q.    And why did you do that?

A.    Pardon?

Q.    Why did you offer to pay for Sophie's veterinarian bills?

A.    Because it was my dog that got loose from my apartment.

Q.    Was it your dog that bit Sophie?

A.    Yes.

Q.    Do you know which one of your dogs bit Sophie?

> A.    <u>Kaltochu did.  K-A-L-T-O-C-H-U.</u>
>
> Q.    Can you spell that.
>
> A.    K-A-L-T-O-C-H-U.
>
> Q.    And what type of dog is Kaltochu?
> A.    American Pit Bull.
>
> Q.    Was it only Kaltochu who bit Sophie?
>
> A.    The first one out, yes.
>
> Q.    What do you mean the first one out?
>
> A.    Well, it all started off washing rugs, and I didn't took [sic] the first set of rugs out --
>
> MR. SCHOETTLE:  <u>The question was: Did the other dog bite Sophie.</u>
>
> THE WITNESS:  <u>Not until later.</u>
>
> Q.    BY MS. [sic] MURATA:  What's the other dog's name?
>
> A.    Nala.
>
> Q.    And what type of dog is Nala?
>
> A.    Rottweller [sic].
>
> Q.    Did Nala also bite Sophie?
>
> MR. TURBIN:  Objection, asked and answered.  She said "later."
>
> Q.    BY MR. MURATA:  Go ahead.
>
> A.    Later.
>
> Q.    Was Nala also in the apartment?
>
> A.    Yes.
>
> Q.    While you were --
>
> A.    She was on the lanai.  They both were.
>
> Q.    <u>So both dogs were in your unit while you were cleaning the rugs.</u>
>
> A.    <u>Yes</u>.

(Emphasis added).

## B.  Procedural Background

On September 4, 2013, Waikiki filed a complaint against Jhun and the Hoʻomaka Village Association of Apartment Owners (**AOAO**) alleging, *inter alia*, that Jhun negligently and/or

recklessly allowed her two dogs into the common area of Hoʻomaka Village without a leash and allowed her dogs to attack Waikiki and Sophie.[5]  On November 15, 2013, Jhun filed a Third Party Complaint against Shimojo, alleging, *inter alia*, that for approximately one year prior to the incident, Shimojo and Sophie teased, taunted and provoked Jhun's dogs.  On March 6, 2015, Shimojo filed his Motion for Summary Judgment.

At the hearing on Shimojo's summary judgment motion, Jhun's counsel argued that:

> [Jhun's counsel:]  Mr. Shimojo was engaged in conduct which was creating a hostile relationship between Ms. Jhun's dogs and Sophie.  Ms. Jhun asked him to stop.  He laughed and refused.
>
> He could have been playing with his dog anywhere in the whole world, but he kept on doing it right under the eyes of Ms. Jhun's dogs which was making them agitated, which is making them irritated.
>
> THE COURT:  That's where the Court disagrees.  I don't think there's a duty for Shimojo to train his dog not to provoke or be in those situations.
>
> [Jhun's counsel]:  Well, as a general duty of reasonable care, no matter what you are doing, and you are creating a situation that's –- [Shimojo] admitted that he was afraid of the dogs getting hostile.  He admitted that. I quoted it from his deposition. He admitted he knew what was happening. He knew what was happening.  He wanted it to happen.  He wanted somebody to get bitten.  He wanted [Waikiki] to get bitten so she could sue.
>
> THE COURT:  That's not what the depositions reflect that's been submitted.  I don't think it establishes that, what you have submitted to the Court.

Jhun's counsel then quoted portions from Shimojo's deposition in which Shimojo testified that when he got Sophie, he declined Jhun's suggestion to socialize Sophie with Jhun's dogs and that Shimojo did not think the dogs had to be socialized after Jhun's dogs exhibited some aggression towards Sophie.[6]

---

[5]  Waikiki and the AOAO are not parties to this appeal.

[6]  The portion of Shimojo's deposition quoted by Jhun's counsel during the hearing is as follows:

> Q  Now, at the time you got Sophie, [Jhun] already had her two dogs, correct?
>
> (continued...)

During the hearing, the Circuit Court rejected Jhun's theory of duty, stating:

> THE COURT:  So the Court is saying if [Jhun's] dog bit someone, [Shimojo's] dog didn't have a duty to be socialized.  Your client's dog had the duty not to bite someone, to be trained in a manner that it wouldn't bite someone.
>
> There's no -- I am not going to -- I don't see a basis of the Court creating a duty on third-party dogs to be socialized.
>
> [Jhun's counsel]:  All right.  He knows they are getting aggressive, he knows that's going to happen, and I am saying -- arguing that that's what he wants.  But, you know, I mean --
>
> THE COURT:  I mean, you are pointing out to his mental state whether or not he believes they should be socialized.  You don't point to facts showing that he created the situation that made your client's dog a danger.

The Circuit Court then orally granted Shimojo's Motion for Summary Judgment and entered its written order on June 18, 2015.[7]  Subsequently, as noted above, the Circuit Court entered

---

[6](...continued)

> A  Yes, [I] think so.
> Q  And when you got Sophie, [Jhun] suggested that the dogs be socialized, get to know each other, didn't she?
> A  I'm not sure. Maybe.
> Q  Maybe?
> A  Maybe. Sure.
> Q  Did you make any attempt to socialize Sophie with [Jhun's] next door dogs?
> A  No, I don't think so. No. The dogs would always be upstairs in the kennel or on the lanai. There was -- yeah. Whenever I would walk Sophie, then there would be nobody home or they'd be upstairs on the lanai, you know.
> Q  Well, on the first occasion when [Jhun's] dogs exhibited some aggression towards Sophie, did you not think maybe we ought to let these dogs socialize so that they don't exhibit aggressive behaviors toward each other?
> A  No. No, I didn't really.
> Q  You never did. And you don't recall whether or not [Jhun] ever suggested that that be done?
> A  No, I don't recall.
> Q  Okay. So you don't deny it?
> A  As far as?
> Q  She might have?
> A  Yeah, anything.

[7]  After the Order Granting Summary Judgment dismissed the third party claim against Shimojo, the remaining parties, Jhun, Waikiki, and the AOAO were referred to non-binding arbitration.  On December 9, 2015, Jhun, Waikiki and the AOAO settled and filed a Stipulation for Dismissal with Prejudice (**Stipulation for Dismissal**) as to all claims and parties.  However, Shimojo was not included in the Stipulation for Dismissal and did not sign the

(continued...)

the Final Judgment on the Third-Party Complaint on August 11, 2017.

## III.  Standards of Review

### A.  Summary Judgment

The grant or denial of summary judgment is reviewed *de novo*.  Nozawa v. Operating Eng'rs Local Union No. 3, 142 Hawaiʻi 331, 338, 418 P.3d 1187, 1194 (2018) (citing Adams v. CDM Media USA, Inc., 135 Hawaiʻi 1, 12, 346 P.3d 70, 81 (2015)); see also Ralston v. Yim, 129 Hawaiʻi 46, 55, 292 P.3d 1276, 1285 (2013).

"Summary judgment is appropriate if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law."  Nozawa, 142 Hawaiʻi at 342, 418 P.3d at 1198 (brackets omitted) (quoting Adams, 135 Hawaiʻi at 12, 346 P.3d at 81).  "A fact is material

---

⁷(...continued)
stipulation.  In his answering brief, Shimojo argues that on August 31, 2016, while the case was pending before the Hawaiʻi Supreme Court, Shimojo signed the Stipulation for Dismissal in a "counter-part signature" and filed the document in the Circuit Court.  Shimojo contends that because he signed the Stipulation for Dismissal, this court no longer has jurisdiction over the issues on appeal and that Jhun terminated her right to further litigate the claims against Shimojo.  This challenge to jurisdiction is without merit.

The Stipulation for Dismissal provides:

> IT IS STIPULATED AND AGREED by and between [Waikiki] and [the AOAO] and [Jhun], through their respective counsel, that pursuant to Rule 41(a)[(]1)(B) of the Hawaii Rules of Civil Procedure, all claims asserted in the Complaint filed on September 4, 2013 against [the AOAO and Jhun]; all Counter-Claims filed November 15, 2013 by Violet Jhun against Raevyn Waikiki; and all Cross-Claims filed September 12, 2013 by [the AOAO] against Violet Jhun are hereby dismissed with prejudice.

(Emphases added).

Shimojo acknowledges the remaining parties voluntarily entered into the Stipulation for Dismissal and did not include Shimojo or Jhun's third party claim against him because it had been dismissed through the Order Granting Summary Judgment.  Notwithstanding Shimojo's contention that the Stipulation for Dismissal dismissed all claims as to all parties, Shimojo was not a party to the Stipulation for Dismissal and Jhun did not agree to dismiss her claim against him. Thus, Shimojo's counter-part signature does not affect our jurisdiction over this appeal.

if proof of that fact would have the effect of establishing or refuting one of the essential elements of a cause of action or defense asserted by the parties." Id. (quoting Adams, 135 Hawaiʻi at 12, 346 P.3d at 81).

The moving party has the burden to establish that summary judgment is proper. Id. (citing French v. Haw. Pizza Hut, Inc., 105 Hawaiʻi 462, 470, 99 P.3d 1046, 1054 (2004). "Once a summary judgment movant has satisfied its initial burden of producing support for its claim that there is no genuine issue of material fact, the party opposing summary judgment must demonstrate specific facts, as opposed to general allegations, that present a genuine issue worthy of trial." Id. (internal quotation marks, brackets, and citation omitted). "The evidence must be viewed in the light most favorable to the non-moving party." Id. (quoting Adams, 135 Hawaiʻi at 12, 346 P.3d at 81) (brackets and citation omitted).

### B.  Duty of Care

The appellate court "addresses whether a defendant owes a duty of care to a particular plaintiff as a question of law under the right/wrong standard." Pulawa v. GTE Hawaiian Tel., 112 Hawaiʻi 3, 10, 143 P.3d 1205, 1212 (2006) (citation omitted).

### IV.  Discussion

### A.  Imposition of a Legal Duty for a Negligence Claim

> In order to prevail on a negligence claim, a plaintiff is required to prove all four of the necessary elements of negligence:
>
> (1)  A duty, or obligation, recognized by the law, requiring the defendant to conform to a certain standard of conduct, for the protection of others against unreasonable risks;
>
> (2)  A failure on the defendant's part to conform to the standard required: a breach of the duty;
>
> (3)  A reasonably close causal connection between the conduct and the resulting injury; and
>
> (4)  Actual loss or damage resulting to the interests of another.

Molfino v. Yuen, 134 Hawaiʻi 181, 184, 339 P.3d 679, 682 (2014) (format altered).

13

"A prerequisite to any negligence action is the existence of a duty owed by the defendant to the plaintiff." Id. "Whether a duty exists is a 'question of fairness that involves a weighing of the nature of the risk, the magnitude of the burden of guarding against the risk, and the public interest in the proposed solution.'" Id. at 184-85, 339 P.3d at 682-83 (quoting Hao v. Campbell Estate, 76 Hawaiʻi 77, 80, 869 P.2d 216, 219 (1994)).

> The existence of a duty owed by the defendant to the plaintiff, that is, whether such a relation exists between the parties that the community will impose a legal obligation upon one for the benefit of the other—or, more simply, whether the interest of the plaintiff which has suffered invasion was entitled legal protection at the hands of the defendant, is entirely a question of law.

Pulawa, 112 Hawaiʻi at 11-12, 143 P.3d at 1213-14 (ellipsis omitted) (quoting Knodle v. Waikiki Gateway Hotel, Inc., 69 Haw. 376, 385, 742 P.2d 377, 383 (1987).

With regard to imposing a legal duty in tort, the Hawaiʻi Supreme Court has stated:

> In considering whether to impose a duty of reasonable care on a defendant, we recognize that duty is not sacrosanct in itself, but only an expression of the sum total of those considerations of policy which lead the law to say that the particular plaintiff is entitled to protection. Legal duties are not discoverable facts of nature, but merely conclusory expressions that, in cases of a particular type, liability should be imposed for damage done. In determining whether or not a duty is owed, we must weigh the considerations of policy which favor the [plaintiff's] recovery against those which favor limiting the [defendant's] liability. The question of whether one owes a duty to another must be decided on a case-by-case basis. However, we are reluctant to impose a new duty upon members of our society without any logical, sound, and compelling reasons taking into consideration the social and human relationships in our society.

Molfino, 134 Hawaiʻi at 185, 339 P.3d at 683 (emphasis added) (quoting McKenzie v. Hawaiʻi Permanente Med. Group, Inc., 98 Hawaiʻi 296, 301, 47 P.3d 1209, 1214 (2002).

The Hawaiʻi Supreme Court has also articulated several factors in determining whether to impose a duty on a tort defendant:

> Whether a special relationship exists, the foreseeability of harm to the injured party, the degree of certainty that the

14

> injured party suffered injury, the closeness of the
> connection between the defendants' conduct and the injury
> suffered, the moral blame attached to the defendants, the
> policy of preventing harm, the extent of the burden to the
> defendants and consequences to the community of imposing a
> duty to exercise care with resulting liability for breach,
> and the availability, cost, and prevalence of insurance for
> the risk involved.

Pulawa, 112 Hawaiʻi at 12, 143 P.3d at 1214 (brackets and
citation omitted).

"[I]n the context of determining the existence and
scope of a duty, foreseeability is a question of law for the
court to resolve."  Id. at 13, 143 P.3d at 1215.  "[I]n
determining the scope of the defendant's duty, the focus is on
the defendant's viewpoint, that is, whether the defendant could
reasonably foresee the plaintiff's injury."  Id. at 16, 143 P.3d
at 1218 (quoting Yager v. Illinois Bell Tel. Co., 667 N.E.2d
1088, 1092 (Ill. App. Ct. 1996)).

> Foreseeability as it impacts duty determinations
> refers to the knowledge of the risk of injury to be
> apprehended.  The risk reasonably to be perceived
> defines the duty to be obeyed; it is the risk
> reasonably within the range of apprehension, of injury
> to another person, that is taken into account in
> determining the existence of the duty to exercise
> care.

Id. at 13, 143 P.3d at 1215 (brackets and citation omitted). "The
test of foreseeability is whether there is some probability of
harm sufficiently serious that a reasonable and prudent person
would take precautions to avoid it."  Id. at 12, 143 P.3d at 1214
(internal quotation marks and citation omitted).  However, "[i]t
does not mean foreseeability of any harm whatsoever, and it is
not sufficient that injury is merely possible."  Id.  Moreover,
the concept of duty involves more than mere foreseeability of
harm.  Id. at 13, 143 P.3d at 1215 (citing Taylor-Rice v. State,
91 Hawaiʻi 60, 71-72, 979 P.2d 1086, 1097-98 (1999)).

> A court's task—in determining "duty"—is not to decide merely
> whether a particular plaintiff's injury was reasonably
> foreseeable in light of a particular defendant's conduct,
> but rather to evaluate more generally whether the category
> of negligent conduct at issue is sufficiently likely to
> result in the kind of harm experienced that liability may
> appropriately be imposed on the negligent party.

Id. (emphasis added) (brackets omitted) (quoting Taylor-Rice, 91 Hawaiʻi at 72, 979 P.2d at 1098).

### B.  The Question of Legal Duty in this Case

In this case, Jhun does not argue that Shimojo had a duty to control Jhun's dogs.  Jhun admits that the duty to control her dogs is hers alone.  Instead, Jhun contends the Circuit Court erred in granting summary judgment in favor of Shimojo because Shimojo owed "the duty to exercise ordinary care in the conduct of one's own activities to avoid foreseeable harm to foreseeable plaintiffs[.]"  Jhun asserts that "[e]very person has a duty to exercise ordinary care in his or her conduct to avoid foreseeable harm to persons who might foreseeably be harmed by that activity."  In support of her argument, Jhun relies on Doe Parents No. 1 v. State Dept. of Educ., 100 Hawaiʻi 34, 72, 58 P.3d 545, 583 (2002), and argues the Hawaiʻi Supreme Court established that, "the State is, as is any person, generally required to exercise only 'ordinary care' in the activities it affirmatively undertakes to prevent foreseeable harm to others." Id.[8]

To the extent that Jhun asserts Doe Parents necessarily establishes a duty on Shimojo in this case, we disagree.  Doe Parents did not establish the existence of a duty on all persons at all times, and Doe Parents did not deal with circumstances similar to this case.  Rather, "[t]he question of whether one

---

[8]  We note the quote Jhun cites from Doe Parents is incomplete.  In Doe Parents, Hawaiʻi Supreme Court stated:

> Absent a duty to adhere to a particular standard of care by virtue of the State and either the plaintiff or the third person sharing a "special relationship" (or, alternatively, because a statute or administrative rule or regulation mandates that the defendant adhere to a particular standard of care, see, e.g., Tseu ex rel. Hobbs v. Jeyte, 88 Hawaiʻi 85, 90-92, 962 P.2d 344, 350-51 (1998); Upchurch[ v. State], 51 Haw. [150,] 154, 454 P.2d [112,] 115[ (1969)]), the State is, as is any person, generally required to exercise only "ordinary care" in the activities it affirmatively undertakes to prevent foreseeable harm to others. Upchurch, 51 Haw. at 152, 454 P.2d at 114[.]

Id.  (Emphases added).

owes a duty to another must be decided on a <u>case-by-case basis</u>." <u>Molfino</u>, 134 Hawaiʻi at 185, 339 P.3d at 683 (emphasis added).

Here, Jhun alleged that Shimojo's negligent conduct was that: he regularly played with his dog Sophie on the common area grass lawn in view of her dogs for a year before the subject incident, making sounds and gestures that annoyed her dogs such that her dogs would pace, whine and get extremely agitated; he allowed his dog Sophie, while indoors, to bark at her dogs as they walked past; and he refused her request to socialize his dog Sophie with her dogs.  Jhun contends that Shimojo's conduct irritated and provoked her dogs, thus causing the subject incident where they escaped from her apartment.

We recognize that there could be circumstances where an individual could be aware that his or her conduct will likely provoke a dog to act aggressively and cause harm, such that the individual has a duty to refrain from such conduct.  However, <u>under the circumstances of this case</u>, we conclude that Shimojo did not have a legal duty to Jhun to refrain from the conduct that she asserts caused the subject incident and caused her harm.

Shimojo argues that applicable statutes and common law do not impose a duty on him in this case, citing Hawaii Revised Statutes (**HRS**) § 663-9.1 (1993), under which provocation is recognized as a defense from civil liability for a dog owner whose dog caused either personal or property damage to any person.  For context, we start with HRS § 663-9 (1993), which states:

> **Liability of Animal Owners.**  (a)  The owner or harborer of an animal, if the animal proximately causes either personal or property damage to any person, shall be liable in damages to the person injured regardless of the animal owner's or harborer's lack of scienter of the vicious or dangerous propensities of the animal.
> (b)  The owner or harborer of an animal which is known by its species or nature to be dangerous, wild, or vicious, if the animal proximately causes either personal or property damage to any person, shall be absolutely liable for such damage.

Neither party asserts that HRS § 663-9 establishes Shimojo's duty or liability in this case.  However, as noted, Shimojo points to

HRS § 663-9.1, which provides in pertinent part:

> **Exception of animal owners to civil liability**.
>
> . . . .
>
>> (c)  Notwithstanding sections 663-1 and 663-9, any owner or harborer of an animal shall not be liable for any civil damages resulting from actions of the animal where the trier of fact finds that:
>>
>>> (1)  The animal caused such damage as a proximate result of being teased, tormented, or otherwise abused without the negligence, direction, or involvement of the owner or harborer[.]

We further note that, under Revised Ordinances of Honolulu 1990 (**ROH**) § 7-7.2 (Supp. No. 12, 2-08), provocation is recognized as a defense from criminal liability for injuries to another person or animal.  See also ROH § 7-7.1 (Supp. No. 12, 2-08)[9] (providing the definition of "provocation").

Under the circumstances of this case, we agree with Shimojo that existing statutes and the county ordinance do not establish a duty of reasonable care on his part related to the

---

[9]  ROH § 7-7.1 (Supp. No. 12, 2-08) provides, in relevant part:

> **Sec. 7-7.1  Definitions.**
> . . . .
>
> "Provocation" means the attack by a dog upon a person or animal was precipitated under the following circumstances:
> (1)    The dog was protecting or defending its owner or a member of its owner's household from an attack or assault;
> (2)    The person attacked was committing a crime or offense while on the property of the owner of the dog;
> (3)    The person attacked was teasing, tormenting, abusing or assaulting the dog or at any time in the past had teased, tormented, abused or assaulted the dog;
> (4)    The dog was attacked or menaced by the animal or the animal was on the property of the owner of the dog;
> (5)    The dog was responding to pain or injury inflicted by the attacked person or animal;
> (6)    The dog was protecting itself, its kennels or its offspring from the attacked person or animal;
> (7)    The person or animal attacked was disturbing the dog's natural functions, such as sleeping or eating, while the dog was on its owner's property; or
> (8)    The dog was responding to a command or encouragement to attack the person or animal.

18

incident in this case.  Rather, the statutory framework related to HRS § 663-9.1 provides an <u>exception</u> to civil liability and does not <u>create</u> an applicable duty of care in these circumstances.  Further, as Shimojo asserts, the county ordinance addresses provocation where "<u>[t]he person attacked</u> was teasing, tormenting, abusing or assaulting the dog or at any time in the past had teased, tormented, abused or assaulted the dog[,]" which is not the situation here.

As to the issue of foreseeability as it impacts duty, we hold that the risk of injury in the circumstances of this case did not trigger a legal duty on Shimojo to take the action claimed by Jhun.  In assessing whether Shimojo had a legal duty, we must focus on whether, from his viewpoint, Shimojo could have reasonably foreseen Jhun's asserted injuries.  <u>Pulawa</u>, 112 Hawaiʻi at 16, 143 P.3d at 1218.  In other words, whether Shimojo could have reasonably foreseen that his conduct would cause Jhun's dogs to escape from her apartment as Waikiki and Sophie returned to their apartment and attack Sophie, resulting in injuries to Waikiki and Jhun.  There is no evidence that Shimojo was aware that Jhun's dogs were becoming aggressive or that they were exhibiting aggressive behaviors such that they would escape Jhun's apartment and the subject incident would result.  In her declaration filed in opposition to the Motion for Summary Judgment, Jhun stated that whenever Shimojo played with Sophie downstairs, her dogs "would begin pacing and whining and got extremely agitated."  Jhun also stated that "[she] complained to [Shimojo] about him doing this as it was irritating [her] dogs[,]" and that she suggested socializing their dogs "so that they would become familiar and friendly."  Finally, Jhun also stated that while walking her dogs, Sophie would bark aggressively at her dogs from within Shimojo's apartment, which caused Jhun's dogs to "react aggressively as well."  However, given the undisputed evidence, Shimojo playing with Sophie or Sophie's barking were not outside normal canine behavior so as to be considered "aggressive."  <u>See</u> <u>Seybolt v. Wheeler</u>, 839 N.Y.S.2d

830, 832 (N.Y. App. Div. 2007) (explaining that threatening or aggressive dog behavior includes growling, snapping or baring its teeth while barking and chasing small animals is considered normal canine behavior).  It cannot be said that, from Shimojo's viewpoint, either Waikiki, Sophie, or Jhun were foreseeably endangered by Shimojo's conduct such that Jhun's dogs would escape from her apartment and attack Sophie and injure Waikiki and Jhun.  Given the undisputed circumstances in this case, Shimojo's alleged conduct was not sufficiently likely to result in the kind of harm experienced such that liability may appropriately be imposed on him.  Pulawa, 112 Hawaiʻi at 13, 143 P.3d at 1215.

Therefore, under the circumstances of this case, Shimojo did not owe a duty of care to Jhun not to engage in the conduct she asserts established his legal duty, *i.e.,* that Shimojo should not have played with Sophie in the common area lawn; should not have allowed Sophie to bark at Jhun's dogs when Jhun walked them; and that Shimojo should have agreed to Jhun's request to socialize Sophie with Jhun's dogs.  Accordingly, we hold that the Circuit Court did not err in granting summary judgment.

## V.  Conclusion

For these reasons, the Circuit Court's August 11, 2017 "Final Judgment" is affirmed.

DATED:  Honolulu, Hawaiʻi, September 30, 2021.

On the briefs:

Walter R. Schoettle,
for Third-Party Plaintiff/
Appellant.

Richard Turbin,
Rai Saint Chu,
Janice D. Heidt,
for Third-Party Defendant/
Appellee.

/s/ Lisa M. Ginoza
Chief Judge

/s/ Katherine G. Leonard
Associate Judge

/s/ Clyde J. Wadsworth
Associate Judge